## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ANNETTE M. HOLLAND,**                    Chapter 13
     Debtor                              Case No. 04-18099-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ANNETTE M. HOLLAND,**
     Plaintiff,
v.                                          Adv. P. No. 06-1418
**EMC MORTGAGE CORPORATION,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matters before the Court are: (1) the "Application of Ablitt & Charlton, PC for Compensation as Counsel to Secured Creditor, EMC Mortgage Corporation," as supplemented; (2) the "Application of Shapiro & Kreisman for Compensation as Counsel to Secured Creditor, Washington Mutual Bank (Predecessor-In-Interest to EMC Mortgage Corporation),"as supplemented; (3) the "Application for Compensation and Reimbursement" filed by Attorney David G. Baker as counsel to the Debtor in this Chapter 13 case and in a prior Chapter 13 case; and (4) "Defendant EMC Mortgage Corporation's Motion to Dismiss Complaint" in which EMC Mortgage Corporation seeks dismissal of the Debtor's Complaint.

The matters emanate from a lengthy dispute among the Debtor, Annette M. Holland

(the "Debtor"), and two of her prior mortgagees, EMC Mortgage Corporation ("EMC") and

Washington Mutual Bank, FA ("Washington Mutual"),[1] concerning substantial legal fees

and costs assessed by them in connection with two foreclosure proceedings and three of

her Chapter 13 bankruptcy cases.[2]  The Debtor disputes the reasonableness of the amounts

claimed by the mortgagee and has filed lengthy objections to the applications filed by

counsel to EMC and counsel to EMC's predecessor, Washington Mutual.  Additionally, the

United States Trustee and the Chapter 13 Trustee have objected to the Application for

Compensation and Reimbursement filed by David G. Baker ("Attorney Baker" or "Debtor's

Counsel") in which he seeks payment for services performed in the Debtor's pending

Chapter 13 case, as well as one of her prior Chapter 13 cases.  As an added wrinkle in the

present case, the Debtor recently obtained a reverse mortgage and both her counsel and

EMC have been paid.  As a result, the Court must determine whether any amounts paid

to the parties should be disgorged and remitted to the Debtor.  Finally, the Court must

determine whether to grant EMC's Motion to Dismiss the Debtor's five-count Complaint,

---

[1] Washington Mutual Bank, FA was the successor-in-interest to Washington Mutual Home Loans, Inc., which in turn was the successor by merger to Fleet Mortgage Corp., which was formerly known as Fleet Real Estate Funding Corp.  The Debtor obtained her mortgage from Fleet Real Estate Funding Corp.

[2] Including the pending case, the Debtor has filed a total of six Chapter 13 cases: Case No. 92-10286-JNF commenced on January 13, 1992 and dismissed on November 6, 1992; Case No. 93-10382-JNF commenced on January 15, 1993 and dismissed on May 21, 1993; Case No. 93-19496-JNF commenced on October 22, 1993 and dismissed on March 15, 1995; Case No. 01-18731-CJK commenced on November 16, 2001 and dismissed on September 19, 2002; and Case No. 02-17758-CJK commenced on October 28, 2002 and dismissed on August 19, 2004.  All of the cases have involved the Debtor's real property located at 90 Belnel Road, Mattapan, Massachusetts.

which contains allegations that EMC violated, *inter alia,* the Real Estate Settlement

Procedures Act of 1974.

With respect to the Applications filed by Shapiro & Kreisman and Ablitt & Charlton,

PC, the Debtor challenges the reasonableness of the fees and disbursements claimed by the

mortgagees. Nevertheless, the facts necessary to decide the reasonableness of those fees,

costs, and charges, are not in dispute, and no party has requested an evidentiary hearing.

Similarly, with respect to Debtor's Counsel's Application, no party requested an

evidentiary hearing. Based upon the undisputed facts, the Court now makes the following

findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

The Debtor objected to EMC's Motion to Dismiss. To prevail on its Motion to

Dismiss, EMC must establish that the Debtor failed to plead plausible claims upon which

relief can be granted. *See* <u>Bell Atlantic Corp. v. Twombly</u>, __ U.S. __, 127 S.Ct. 1955 (2007).

For the reasons set forth below, the Court finds that EMC sustained its burden with respect

to four of the five counts set forth in the Debtor's Complaint.

**II. FACTS** [3]

The Debtor, a self-employed house cleaner earning approximately $3,400 per month

from her business, social security, and retirement income, filed a voluntary Chapter 13

petition, her sixth Chapter 13 case in twelve years, on October 4, 2004 (the "Pending Case").

She has been represented by Attorney Baker since the commencement of her case.

---

[3] The Court takes judicial notice of all of the records in the Debtor's pending case and her prior bankruptcy cases. *See* <u>In re Hyde</u>, 334 B.R. 506, 509 (Bankr. D. Mass. 2005) (the court may take judicial notice of its records in a case).

3

Attorney Baker also represented the Debtor in one of her prior Chapter 13 cases, Case No.

02-17758-CJK, which the Debtor filed on October 28, 2002 (the "2002 Case").

A. The 2002 Case

At the commencement of the Debtor's 2002 Case, Attorney Baker filed a "Disclosure

of Compensation under 11 U.S.C. 329 [sic] and Bankruptcy Rule 2016(b)" disclosing that

he had been paid $1,000 and was to be paid $1,500 for representing the Debtor.  In her 2002

Case, the Debtor disclosed on Schedule D-Creditors Holding Secured Claims that

Washington Mutual held a first mortgage (the "Mortgage") on her residence located at 90

Belnel Road, Mattapan, Massachusetts (the "Property").  At the time the Debtor filed the

2002 Case, she valued her Property at $155,000 and listed Washington Mutual as a secured

creditor with a claim in the sum of  $82,000.  As discussed in more detail below, the

Mortgage, which secured a note held by Washington Mutual in the original principal

amount of $70,000, contains a provision which permits the lender to recover certain

collection fees and costs from the mortgagor.  In the 2002 Case, Washington Mutual timely

filed a secured proof of claim on December 10, 2002 in the amount of $84,262.94.  It later

assigned its claim to EMC.

EMC and the Debtor litigated a number of issues in the 2002 Case.  On May 8, 2003,

EMC filed an objection to the Debtor's Chapter 13 Plan,[4] which the Court sustained on June

_____

[4] On December 10, 2002, Washington Mutual had filed an objection to
confirmation.  In that objection, it averred that the Debtor owed it $84,262.94, including
a total prepetition arrearage of $18,119.68.  It later withdrew that objection.  On May 8,
2003, when EMC, as Washington Mutual's assignee, objected to confirmation it did so
on the grounds that the Debtor improperly sought "to modify the terms of the note and

4

26, 2003.  On the same day, the Court  ordered the Debtor to file an amended Chapter 13

Plan by July 10, 2003.    Eighteen days later, after the expiration of the appeal period from

the order sustaining the objection to confirmation,[5] the Debtor filed a "Motion for Relief

from Order Sustaining Objection to Confirmation" in which she averred that EMC's

objection to confirmation was untimely.  On July 24, 2003, the Court denied that Debtor's

motion, stating that it had "heard and rejected these same meritless arguments previously."

The Debtor appealed, filing both a Notice of Appeal and a Motion for Leave to Appeal.

While the Debtor pursued her appeal, she filed other plans to which either the

Chapter 13 Trustee or EMC objected.  On October 30, 2003, the United States Bankruptcy

Appellate Panel for the First Circuit (the "BAP") issued its mandate denying the Motion

for Leave to Appeal and dismissing the Appeal.   On January 28, 2004, following the

January 15, 2004 entry of the mandate on the Bankruptcy Court docket, the Debtor

appealed the BAP decision to the United States Court of Appeals for the First Circuit.  Five

months later and before the First Circuit issued a decision, the Debtor and EMC entered

into a Stipulation of Settlement (the "Appeal Stipulation"), dated June 28, 2004.   The

Appeal Stipulation provided  in relevant part the following:

> . . . Holland shall voluntarily dismiss this appeal without prejudice and
> without costs to either party on condition and in consideration of EMC

---

mortgage by including the total secured claim in the amount to be paid through the
plan, failing to account for tax increases, insurance increases and interest."

[5] An order denying confirmation is not a final appealable order, and a motion for
leave to appeal would have been necessary.  *See* <u>Bentley v. Boyajian (In re Bentley)</u>, 266
B.R. 229, 233-34 (B.A.P. 1st Cir. 2001).

forbearing from any actions to foreclose its mortgage during the pendency of any appeal during the present bankruptcy case in which Holland is the appellant and EMC is the opposing party[.]

On August 19, 2004, the Court dismissed the Debtor's 2002 Case following the submission of an Affidavit of Non-Compliance by the Chapter 13 Trustee with respect to the Debtor's default under the terms of an Agreed Order requiring the Debtor to make monthly payments of $1,100.[6]  Notably, the Debtor proposed four Chapter 13 plans during the 2002 Case, none of which were confirmed.  Debtor's Counsel did not file a fee application in the 2002 Case, and the Court never awarded him fees in excess of the $2,500 permitted by Massachusetts Local Bankruptcy Rules, Appendix 1, Rule 13-7(b).[7]

B. The Pending Case

As noted above, the Debtor commenced the Pending Case on October 4, 2004, approximately six weeks after the dismissal of her 2002 Case.  The Court set February 8, 2005 as the bar date for filing proofs of claim.

---

[6] In her response to the Affidavit of Non-Compliance, the Debtor acknowledged that she had been unable to meet her obligations as provided in the Agreed Order dated April 22, 2004.

[7] Rule 13-7(b), which is set forth in Appendix 1 of the Massachusetts Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Massachusetts, provides the following:

> Unless otherwise ordered by the Court, if debtor's counsel's total compensation prior to confirmation of a plan is $2,500 or less, the disclosure of the compensation in the Rule 2016(b) Statement shall be sufficient notwithstanding compensation for post confirmation services in an amount not exceeding $500, and the filing of an itemized application for compensation shall be excused, unless the Court orders otherwise.

6

On the petition date, Debtor's Counsel filed his "Statement Pursuant to FRBP 2016(b)" in which he disclosed 1) that the Debtor had paid him $3,315 for legal services in the 2002 Case, a sum in excess of the $2,500 he represented he was to receive in that case in the Rule 2016(b) Statement he filed on October 28, 2002; and 2) that the Debtor had paid him $2,500 for the Pending Case.  In his 2016(b) Statement, Attorney Baker also disclosed that he intended to bill the Debtor at the rate of $200 per hour "for all services rendered during this case, including adversary proceedings and appeals, if any," noting that "[i]f the total fee exceeds $2,500, counsel may apply to the Court for approval of additional fees, in accordance with Local Rule." Attorney Baker did not represent that the Debtor owed him any fees for the 2002 Case, and he did not indicate that his $200 hourly rate was subject to increase.

In addition to the Statement, Debtor's Counsel also filed a "Chapter 13 Agreement Between Debtor and Counsel" in which he disclosed the following:

> Initial fees charged in *this* case are $2,500.00. Prior to filing the case, the debtor has given the attorney a check for $10,264.00, representing a refund from the Chapter 13 Trustee from the debtor's prior case. The attorney will pay $5,000 to himself for the prior case and the present case. The balance shall pay the filing fee for this case and the remainder will be paid to the Chapter 13 Trustee for the present case. If the initial fees are not sufficient to compensate the attorney for the legal services rendered in this case, the attorney further agrees to apply to the court for additional fees where required by Local Rule.

(emphasis in original).[8]  In the Debtor's Statement of Financial Affairs, Item 9,"Payments

---

[8] The Court lacks information about whether Attorney Baker remitted any portion of the refund to the Chapter 13 Trustee.

7

related to debt counseling or bankruptcy," the Debtor listed a payment to Debtor's Counsel

on September 21, 2004 in the amount of $5,000.  The Debtor did not list any fees owed to

Debtor's Counsel in her schedules; Debtor's Counsel did not file a proof of claim in the

Pending Case.

C. The EMC Claim

The Debtor's dispute with EMC has continued unabated during the Pending Case.

On October 25, 2004, EMC timely filed a secured proof of claim in the amount of

$109,498.21, inclusive of a prepetition mortgage arrearage, together with an itemization of

certain collection costs, fees, and advances (the "EMC Claim").  EMC appended a copy of

the thirty-year, fixed rate Mortgage to its proof of claim.[9]  The Mortgage document

establishes that, on March 21, 1995, the Debtor borrowed the sum of $70,000 from Fleet Real

Estate Funding Corp.  Section 7 of the Mortgage provides, in part, the following:

> If Borrower fails to perform the covenants and agreements contained in this
> Security Instrument, or there is a legal proceeding that may significantly
> affect Lender's rights in the Property (such as a proceeding in bankruptcy
> . . .), then Lender may do and pay for whatever is necessary to protect the
> value of the Property and Lender's rights in the Property. Lender's actions
> may include. . . appearing in court, paying reasonable attorneys' fees and
> entering on the Property to make repairs. . . Any amounts disbursed by
> Lender under this paragraph 7 shall become additional debt of Borrower
> secured by this Security Instrument.

EMC also attached a one page "Proof of Claim Breakdown Sheet" to its proof of claim in

---

[9] Because of the absence of an adjustable rate rider, the Court infers that the
Mortgage is a fixed rate mortgage.  The Court also infers that the Mortgage is non-
modifiable.  *See* 11 U.S.C. § 1322(b)(2) and 1322(b)(5).  Although a later filed copy of the
Mortgage was accompanied by a "1-4 Family Rider," the Debtor did not report receipt
of rental income on Schedule I.

which it set forth a principal balance of $66,143.26, as well as arrears in the total sum of

$43,354.95, comprised of 39 monthly payments of $569.54 and other costs and charges.[10]

It provided line item amounts for those charges such as "Prev Sver [sic] Corp Advances-

$8,765.59," "Bad Check- $25," "Prior FC Costs/Corp - $911.32," and "Lit Atty Fees -

$5,385."  Many of the line items in the breakdown sheet are incomprehensible and require

an understanding of the mortgagee's internal abbreviations or codes.

Pursuant to Massachusetts Local Bankruptcy Rules, Appendix 1, Rule 13-13(b),[11] the

deadline for the Debtor to object to the EMC Claim was March 10, 2005.  The Debtor did

not object to the EMC Claim and did not seek an extension of time within which to do so.

D. EMC's Objections to Confirmation

Almost six months after commencing the Pending Case and after the deadline for

objecting to proofs of claim, the Debtor, on March 22, 2005, filed her First Amended Pre-

---

[10] In her objection to the Motion for Relief from Stay filed by EMC on October 5, 2006, the Debtor represented that she lacked knowledge of the amount of her monthly mortgage payment.  In the Debtor's 2002 Case, EMC, in a motion for relief from stay, averred that the monthly payment was $643.58.  The Court infers that the higher figure included sums for insurance and taxes.  The inference is substantiated because, on November 10, 2005, at a hearing on a Motion for Relief from Stay filed by EMC on August 10, 2005, the Court ordered the Debtor to pay all taxes and other municipal charges and to pay for adequate insurance on the Property.

[11] The rule provides, in relevant part:

Objections to claims shall be served and filed with the Court within thirty (30) days after the deadline for filing proofs of claims or within such additional time as the Court may allow upon the filing of a motion to extend time and for good cause shown.

Confirmation Chapter 13 Plan.  Through her 48-month Plan, she proposed to make

monthly payments of $1,939 commencing on April 1, 2005[12] and to pay EMC's mortgage

in full in the amount of $109,498.21, subject to the following provision:

> *This provision is based on the Proof of Claim and is without prejudice to the debtor's
> right to object to the claim on any grounds.  Any reduction in this claim is protected
> by the homestead exemption.*

(emphasis in original).  On June 15, 2005, EMC filed a Limited Objection to Confirmation

of the Debtor's First Amended Pre-Confirmation Chapter 13 Plan.  Without citing 11 U.S.C.

§ 1322(b)(2), 1322(b)(5) or § 1325(a)(6), it complained that the Debtor's plan failed to

provide for regular postpetition payments to it and was not feasible.[13]  After numerous

continuances, the Court sustained the Limited Objection by agreement, ordered the Debtor

to pay all taxes and other municipal charges in the ordinary course as they become due, to

maintain and pay for adequate property insurance, and to file a further amended Chapter

13 Plan by November 24, 2005.

On November 27, 2005, the Debtor filed a further amended plan, captioned

erroneously, "First Amended Pre-Confirmation Chapter 13 Plan" (the "Second Amended

Pre-Confirmation Chapter 13 Plan").  Through her fifteen-month, Second Amended Pre-

Confirmation Chapter 13 Plan, the Debtor proposed to make a single lump sum payment

---

[12] As disclosed in her amended Schedule J, the Debtor calculated her disposable
income using an expense figure which *excluded* the monthly mortgage payment to EMC
in the amount of approximately $570.

[13] It had filed a Limited Objection on April 25, 2005, which the Court overruled
on June 9, 2005.  At that time, the Court granted EMC leave to file a supplemental
objection.

of $15,968 with the balance from a refinancing of her Property. She proposed to pay EMC under the following terms and conditions:

> All debt incurred post-petition shall be paid directly by the debtor to the creditor. *In addition, the debtor shall pay the claim of EMC Mortgage Association directly by way of refinancing. The debtor has been informed by Mortgage Solutions of Stoughton, MA, that she is qualified for a so-called "reverse mortgage", and has completed the application process for the same. The amount to be paid shall be based on a payoff letter received from EMC or as may be agreed by the parties or ordered by the Court. The debtor does not admit to the accuracy of the amount stated in EMC's proof of claim. The refinancing shall take place as soon as practicable after issuance of a commitment letter or similar. All taxes and insurance costs related to the debtor's residence, which secures the obligation to EMC, shall be paid by the debtor directly unless otherwise agreed by the parties or ordered by the Court.*

(emphasis in original). In response, EMC filed another Limited Objection to Confirmation on December 21, 2005. EMC asserted that the Debtor failed to address its prepetition debt and was attempting to object to the EMC Claim through her Plan.

The Court conducted a hearing on March 16, 2006. Because the disputed EMC Claim was the major impediment to confirmation of the Debtor's Plan, the Court directed the parties to resolve it through the claims objection process. Because the Debtor had not objected to the EMC Claim and because a refinancing was in prospect, the Court ordered the Debtor to file her objection to the EMC Claim by April 17, 2006 and continued EMC's objection to confirmation generally.

The Debtor did not file an objection to the EMC Claim by the Court-imposed deadline, nor did Debtor's Counsel seek an extension of the time within which to do so. The Debtor, without referring to the Court's direct order, later attempted to explain her failure to object to the claim as follows:

11

[EMC] natters pointlessly about its Proof of Claim and the lack of an objection to it. . . . There was no point to objecting to EMC's claim prior to the time that payment of the claim in cash, instead of by foreclosure, became the reality. Clogging the court's calendar and incurring fees over an issue that could be rendered moot does not advance the expeditious and inexpensive resolution of cases.

Following the refinancing of her Property, discussed in detail below, the Debtor filed, on February 20, 2007, another amended Chapter 13 Plan. In her Third Amended Pre-Confirmation Chapter 13 Plan, erroneously captioned "Second Amended Pre-Confirmation Chapter 13 Plan," the Debtor proposed to pay a 100% dividend to all creditors.[14] Section I. B. of the plan, entitled SECURED CLAIMS, provided:

All debt incurred post-petition shall be paid directly by the debtor to the creditor. *In addition, the debtor has paid the claim of EMC Mortgage Association directly by way of refinancing pursuant to leave of court. Such payment is without prejudice and* [sic] *reservation of rights with respect to any overcharges or improperly charged or collected fees. See Adversary Proceeding no. 06-01418.*

(emphasis in original). On March 5, 2007, EMC filed another Limited Objection to the Debtor's Plan, in which it asserted that the Debtor was seeking to reopen the claims objection process with respect to sums included and itemized in the EMC Claim to which

---

[14] On Schedule D-Creditors Holding Secured Claims, the Debtor listed one secured creditor, EMC. On Schedule E-Creditors Holding Unsecured Priority Claims, the Debtor disclosed that she owed a total of $16,000 in priority debt to the IRS and the Massachusetts Department of Revenue. On Schedule F-Creditors Holding Unsecured Nonpriority Claims, she disclosed total unsecured debt of $12,500. In addition to EMC, only two creditors filed proofs of claim in this case: the IRS filed a proof of claim asserting an unsecured priority claim in the amount of $7,580.69 and a general unsecured claim in the amount of $8,010.37; the Massachusetts DOR filed a proof of claim asserting an unsecured priority claim in the amount of $6,322.60 and a general unsecured claim in the amount of $1,346.33. In her Plan, the Debtor reversed the claims of the IRS, proposing to pay a priority claim of $8,010.37 instead of $7,580.69.

she had not objected.

E. EMC's Motions for Relief from Stay

EMC filed two motions for relief from the automatic stay during the Pending Case. In the first, filed August 10, 2005 (the "August 10th Motion"), EMC asserted that the Debtor had failed to make nine post-petition mortgage payments, totaling $5,126.04.  It further asserted that, as of August 1, 2005, the total due and owing under the terms of the Note and Mortgage was approximately $115,770.37.  In the August 10th Motion, EMC alleged that the liquidation value of the Property was $150,991, a figure which it calculated by deducting $19,409.00 in separately enumerated "reasonable and necessary" expenses from the fair market value of the Property as set forth in the Debtor's schedules ($170,400).[15]  On August 16, 2005, the Debtor objected to the August 10th Motion, asserting, *inter alia,* that it had been filed in bad faith and for the purpose of harassment.  She argued that EMC was to be paid pursuant to her Plan, through the Chapter 13 Trustee, upon confirmation and that EMC should not complain because its objections were delaying confirmation.  The Court denied the August 10th Motion after a hearing on November 10, 2005.

---

[15] The "reasonable and necessary" expenses, included:

| | |
|---|---|
| Realtors' fees at six (6) percent: | $ 10,224.00 |
| Tax deed stamps: | $    775.00 |
| Anticipated closing costs: | $    750.00 |
| Eviction proceedings: | $    710.00 |
| Property maintenance costs: | $  1,000.00 |
| Estimated foreclosure fees and costs: | $  5,000.00 |
| Bankruptcy fees and costs: | $    950.00 |
| | $ 19,409.00 |

13

Almost one year later, on October 5, 2006, EMC filed a second Motion for Relief from Stay (the "October 5th Motion"). In that motion, EMC stated that "[a]s of October 5, 2006, approximately $124,178.37 in principal, interest, late fees and other charges was due with regard to EMC Mortgage Corporation's note and mortgage, exclusive of attorney's fees and costs." Again, EMC alleged a liquidation value of the Property by enumerating and deducting certain expenses from the fair market value of the Property as listed in the Debtor's schedules. The Debtor objected to the October 5th Motion on October 19, 2006, challenging EMC's valuation of the Property, challenging EMC's listed expenses as unreasonable and unnecessary, asserting that relief was not warranted as a refinancing of the Property was in progress, and referring to her intention "to commence an Adversary Proceeding against EMC for statutory damages and other relief." After several continuances, EMC withdrew the October 5th Motion on February 28, 2007, representing that "[p]ayoff funds have been tendered by or on behalf of the Debtor to EMC in connection with the note and mortgage that is the subject of the Motion for Relief from Stay."

In the so-called "Wherefore" clause concluding the October 5th Motion, EMC did not demand a specific sum of money from the Debtor to satisfy the Mortgage. Rather, it requested that the Court grant it relief from the automatic stay

> for the purpose of exercising its rights under its agreement with the debtor(s) and under applicable law, including, without limitation, taking possession of the mortgaged premises and/or foreclosing or accepting a deed in lieu of foreclosure of its mortgage on said premises, and bringing such actions, including, without limitation, summary process proceedings, as are permissible by law.

14

F. <u>The Adversary Proceedings</u>

The Debtor commenced two adversary proceedings during the Pending Case. On February 25, 2006, the Debtor filed Adversary Proceeding No. 06-1164 against Resource One, Inc., f/k/a The Dartmouth Plan, Inc., seeking to discharge a mortgage on the Property originally held by American Door & Window (the "Resource One Adversary Proceeding") and to resolve certain title defects affecting the Property. The Debtor later amended her Complaint to add Citicorp USA, Inc. as a defendant.

The Court entered defaults against the defendants in that adversary proceeding, and, on October 10, 2006, it entered a Judgment discharging the mortgage of American Door & Window.

On November 21, 2006, seven months after the deadline set by the Court for objecting to the EMC Claim, the Debtor commenced Adversary Proceeding No. 06-1418 against EMC (the "EMC Adversary Proceeding"). In her Complaint, the Debtor alleged that, on August 5, 2006, she requested a payoff figure from counsel to EMC via a letter which constituted a "Qualified Written Request" under RESPA; that counsel to EMC responded that it was not authorized to accept the letter; that, on September 5, 2006, the Debtor sent a "virtually identical letter directly to EMC;" that, as of the date of the Complaint, EMC had not responded to the Qualified Written Request; and that, in the August 10th Motion and in the October 5th Motion, EMC, in seeking relief from the automatic stay, claimed entitlement to fees and charges which the Court had not approved as reasonable and necessary. In her Complaint, the Debtor did not specify the amount of

15

damages resulting from EMC's allegedly improper conduct.  Moreover, she did not allege that EMC engaged in a pattern or practice of non-compliance with the provisions of RESPA.

The Debtor formulated five counts: (1) Count I - Violation of the "Servicer Act," known as the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2601 *et seq.*; (2) Count II - Breach of Contract; (3) Count III - Violation of Automatic Stay; (4) Count IV - Violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; and (5) Count V - Declaration and Redemption.  Specifically, through Count I, the Debtor alleged that EMC violated RESPA by failing to respond to her "Qualified Written Request," which she maintained satisfied the requirements of 12 U.S.C. § 2605(e)(1)(B) because it contained a payoff request and was  sent on September 5, 2006 "directly to EMC."[16]  Through Count II, she alleged that EMC breached its contract with her by failing to respond to her "Qualified Written Request" and by seeking to collect improper fees and charges.  Through Count III, she alleged that EMC violated the automatic stay when it "enumerat[ed] . . . additional fees, costs and charges in its motions for relief from the automatic stay [in] an attempt to collect money from the debtor that is not owed either under applicable law or the contract" and that its conduct in setting forth those charges "constitut[ed] an overt action to collect from the debtor in violation of the automatic stay."

---

[16] The Debtor also sent a letter to EMC's counsel.  She did not allege that Ablitt & Charlton were servicers within the meaning of RESPA.  Additionally, she did not allege that they were agents of EMC for purposes of responding to qualified written requests, and she did not name the firm as a defendant.

16

Through Count IV, the Debtor alleged that EMC violated the FDCPA when it "misrepresented the amount due" in the EMC Claim and in its two motions for relief from stay, and, finally, through Count V, she sought a declaration of the payoff amount owed to EMC after payment of damages and attorneys' fees.

EMC moved to dismiss the Complaint, and its motion is pending.

G. The Refinancing

Following resolution of the title issues affecting the Property achieved through the Resource One Adversary Proceeding, the Debtor filed a Motion for Leave to Obtain Credit (the "Refinancing Motion") on December 5, 2006. Through the Refinancing Motion, the Debtor sought authority to obtain a reverse mortgage on the Property which would result in a 100% dividend to general unsecured creditors. In the Refinancing Motion, the Debtor referred to Debtor's Counsel's estimated attorneys' fees in the amount of $25,000, inserting a footnote in which she stated that the amount included fees for "the present and previous cases, appeals and adversary proceedings." The Chapter 13 Trustee filed a Response to the Refinancing Motion, requesting that the Debtor be required to file a further amended plan to pay a 100% dividend to unsecured creditors.

The Debtor attached as an exhibit to her Refinancing Motion a facsimile dated December 9, 2006 from Mortgage Solutions, Inc. which set forth, among other things, the Loan Terms. It contained the following information:

| | |
|---|---|
| Age of Youngest Borrower: | 67 |
| Appraised Property Value: | $325,000 |
| Initial Interest Rate: | 6.50% |
| Monthly Advance: | $513.41 |

17

| | |
|---|---|
| Initial Draw: | $90,000 |
| Line of Credit: | $0.00 |
| Length of Term: | TENURE |

Additionally, it contained estimated "Initial Loan Charges" comprised of "Other Closing Costs" of $9,073.50. On December 13, 2006, the Debtor filed a Notice of Amendment with respect to some of the terms. Although the interest rate and initial draw changed, the Debtor did not amend her statement with respect to the "Initial Loan Charge" and the amount of the monthly payment.

The Court conducted a hearing on the Refinancing Motion on January 11, 2007. At the hearing, Debtor's Counsel represented, on the record, that he had received a payoff letter from EMC. He also represented that the Debtor disputed approximately $25,000 in EMC's fees and charges. The Court granted the Refinancing Motion on January 12, 2007 and expressly directed that $25,000 of the closing proceeds be held in a joint interest bearing escrow account by Debtor's Counsel and counsel to EMC, pending further order of the Court. The Court also ordered EMC to file an itemization of attorneys' fees and costs in accordance with Fed. R. Bankr. P. 2016.

On January 11, 2007, the Court also conducted a hearing on the Motion of Chapter 13 Trustee for Order Dismissing Case and EMC's October 5th Motion. The Court continued EMC's October 5th Motion to March 1, 2007 and ordered the stay to remain in effect.[17] With respect to the Chapter 13 Trustee's Motion to Dismiss, the Court ordered the Debtor to file an amended Chapter 13 Plan by February 12, 2007. The Court did not

---

[17] EMC subsequently moved to withdraw the October 5th Motion.

18

address any of Debtor's counsel's fees or approve payment of them at the hearing.

Contrary to the Court's order, the Debtor did not file an amended Chapter 13 Plan by the February 12, 2007 deadline.[18] Instead, on February 13, 2007, Debtor's Counsel filed a "Report Regarding Refinancing" (the "Report"), together with a HUD Settlement Statement.   In the Report, he disclosed that the reverse mortgage closing (the "Refinancing") occurred on February 6, 2007 and that the closing attorney disbursed the following amounts from the Refinancing proceeds: (1) the sum of $126,269.97 to EMC, which the Debtor claims was "without prejudice and with reservation of rights for the reasons asserted in [the EMC Adversary Proceeding];"[19] (2) $17,481 to the Chapter 13 Trustee to pay the Debtor's Chapter 13 plan obligations; and (3) $25,000 to Debtor's Counsel "in payment of his estimated fee for this case, the debtor's prior bankruptcy cases, and the various adversary proceedings and appeals in those cases."   With respect to amounts paid to himself, Debtor's Counsel stated in the Report: "[i]t is respectfully *suggested* that in view of the debtor's assent to [his] fee reflected by her signature on the HUD statement and the activity reflected by the dockets of the various cases, said fee is reasonable and no fee application should be required." (emphasis added)

The Report unequivocally establishes that Debtor's Counsel did not comply with the

---

[18] The Debtor filed an amended plan on February 20, 2007.  This plan, filed eight days late, is the Debtor's fourth attempt to obtain confirmation of a Chapter 13 Plan in the Pending Case.

[19] Approximately $101,000 of the total payment made to EMC was duly authorized by this Court at the January 11, 2007 hearing.  Debtor's Counsel only challenged fees, costs, and charges in the approximate amount of $25,000.

19

Court's January 12, 2007 order.  The Refinancing occurred without the creation of an

escrow or compliance with applicable bankruptcy rules and procedures regarding fee

applications.  Not surprisingly, the Report elicited responses from both EMC and the

Chapter 13 Trustee.  EMC filed a "Motion to Approve Disbursement to EMC Mortgage

Corporation *Nunc Pro Tunc*" (the "Motion to Approve Disbursement") in which it asserted

that it received the full payment it was rightfully owed from the Refinancing.  It

acknowledged, however, that the disbursement was not in compliance with the Court's

January 12, 2007 order.  Counsel to EMC reported that "EMC was not apprised of the date

of the closing and was not aware of the closing date until the filing of Debtor's Report

Regarding Refinancing." EMC added that it had no opportunity to establish the required

escrow account or otherwise comply with the Court's order.  EMC further asserted that the

EMC Adversary Proceeding was now moot as EMC had been paid in full and any

remaining dispute regarding collection charges should be resolved through EMC's

submission of the itemization of attorneys' fees and costs in accordance with the Court's

January 12, 2007 order.

The Chapter 13 Trustee, in responding to the Report, stated that there was no basis

for a waiver of the requirement that Debtor's Counsel file a fee application, especially

because the fees he received far exceeded the $2,500 contemplated in Massachusetts Local

Bankruptcy Rule, Appendix 1, Rule 13-7(c).  In response to the Report, the Court ordered

Debtor's Counsel to file a fee application in accordance with Fed. R. Bankr. P. 2016 and

Massachusetts Local Bankruptcy Rule 2016-1 by February 27, 2007.[20]

The Debtor objected to EMC's Motion to Approve Disbursement.  In the objection, Debtor's Counsel represented that he did not receive advance notice of the Refinancing closing either and, therefore, could not arrange for the escrow.[21]  The Debtor further argued that the EMC Adversary Proceeding was not rendered moot by payment to EMC because "[t]he complaint alleges, essentially, that EMC has violated the automatic stay by imposing and attempting to collect (and likely collecting through the refinancing) fees and costs that it is not entitled to."

H. The EMC Applications

On February 16, 2007, counsel to EMC and counsel to its predecessor, Washington Mutual, submitted their itemizations of fees and costs in compliance with the Court's January 12, 2007 order.  Shapiro & Kreisman, as counsel to Washington Mutual, filed its application (the "Shapiro Application") seeking $953.50 in fees and $5,454.42 in costs, for a total award of $6,407.92 for services performed in connection with two foreclosure actions with respect to the Property, as well as general representation during the pendency of the Debtor's 2001 and 2002 Cases.  The Shapiro Application covered the time period of August 1, 2001 through October 31, 2004.

---

[20] The Debtor moved on February 28, 2007, a day after the filing deadline, to extend the date to March 19, 2007.  The Court granted the motion in part and extended the deadline to March 8, 2007.

[21] It is unclear who advised the closing attorney to include Attorney Baker's fees in the HUD Settlement Statement in the sum of $25,000 or how Debtor's Counsel received payment of his entire fee without notice of the closing.

Ablitt & Charlton, PC, as counsel to EMC, filed its application (the "Ablitt Application") seeking $10,390.50 in fees and $300 in costs, for a total award of $10,690.50 for services performed as bankruptcy counsel to EMC in the Debtor's 2002 Case and the Pending Case. The Ablitt Application covered the time period from May 8, 2003 through January 31, 2007. Both the Ablitt and Shapiro Applications were signed by Attorney John S. McNicholas who has been employed by both firms.

To further document amounts owed to it, EMC, on February 16, 2007, filed a "Summary Statement of Recoverable Escrow and Corporate Advances filed by EMC Mortgage Corporation" (the "Mortgagee's Statement of Advances") in which it sought additional reimbursement for corporate advances made by it on the Debtor's behalf from 2003 through 2006. According to EMC, the advances consisted of $334.10 for inspection fees, $185 for brokers' price opinions, and $5,390.36 for real estate taxes and hazard insurance payments. Those advances, combined with amounts set forth in the Ablitt and Shapiro Applications, reveal that EMC and Washington Mutual sought a total of $23,007.88 for costs and fees associated with the Debtor's Mortgage obligation.[22] According to EMC, the majority of fees and costs in the Shapiro and Ablitt Applications were incurred prior to the Pending Case and were included in the EMC Claim.

The Debtor objected to the Ablitt and Shapiro Applications and to the Mortgagee's Statement of Advances. She contended that the Applications should be denied as a

---

[22] Even though EMC has already received payment in full from the Refinancing proceeds, the Court shall consider whether EMC should remit any amounts to the Debtor.

22

sanction pursuant to 11 U.S.C. § 362(j)[23] because EMC attempted to collect amounts from

the Debtor in violation of the automatic stay and, with respect to the Ablitt Application

only, because the parties previously entered into the Appeal Stipulation which provided

that each party would bear their own costs. The Debtor alleged that the applicants double

billed her and otherwise assessed charges against her which were unnecessary and/or

excessive.  She  also objected to the Mortgagee's Statement of Advances, asserting that

EMC failed to adequately document the charges.  EMC responded to the objections with

both narrative and documentary substantiation for the charges.  Debtor's Counsel later

filed additional objections to the Applications in which he argued that the provision of the

Mortgage which allows EMC to recoup attorneys' fees from the Debtor is ambiguous and

should be construed against EMC.

I. The Baker Application

On March 9, 2007, one day after the deadline, Debtor's Counsel filed his fee

application (the "Baker Application"), seeking compensation for legal services and

reimbursement for expenses in the aggregate amount of $31,042.50 for work performed on

behalf of the Debtor in both the 2002 Case and the Pending Case.[24]  Counsel allocated the

---

[23] This provision of the Bankruptcy Code was added by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 ("BAPCPA") and allows a party to
secure an order "confirming that the automatic stay has been terminated."  This
provision of BAPCA does not apply to the Pending Case, which the Debtor commenced
in 2004, and it appears to have no logical relation to the Debtor's argument.

[24] Debtor's Counsel calculated the balance owed to him as $25,042.50 after
deducting payments previously made by the Debtor in both cases.  In reality, Debtor's
Counsel has already received $25,000 from the Refinancing proceedings, and the Court

amounts as follows:

(1) $12,014.50, comprised of fees in the sum of $11,640 and expenses in the sum of $374.50, for services performed in the 2002 Case, less payment previously received from the Debtor in the amount of $3,500, inclusive of the $185 filing fee in effect in 2002, for a total of $8,514.50;

(2) $3,954, comprised of fees in the sum of $3,940 and expenses in the sum of $14, for services relating to "BAP & Court of Appeals re denial of confirmation;"[25]

(3) $9,739, comprised of fees in the sum of $9,545 and expenses in the sum of $194, for general services performed in the Pending Case, less the payment previously received from the Debtor in the sum of $2,500, for a total of $7,239;

(4) $3,785 in fees for services performed in the Resource One Adversary Proceeding; and

(5) $1,550 for services performed in the EMC Adversary Proceeding.

Despite the 2016(b) Statement filed in the Pending Case, which reflects an hourly billing rate of $200, Debtor's Counsel disclosed in the Baker Application that he raised his hourly rate from $200 to $225 in 2005 and from $225 to $250 in 2006. The Debtor did not object to the Baker Application. On April 5, 2007, the Court took the Baker Application under advisement, and, on April 9, 2007, ordered the Chapter 13 Trustee and the United States Trustee to submit comments or objections to it.

On April 24, 2007, the Chapter 13 Trustee filed her Response to the Baker

---

must determine whether he should disgorge any of that amount to the Debtor.

[25] It appears from the description of the services rendered and the dates of such services, as set forth in the time sheets attached to the Baker Application, that this work was all performed in connection with the 2002 Case.

Application.  The Chapter 13 Trustee acknowledged that Debtor's Counsel provided some value to the Debtor in the Pending Case as she was able to retain her home, achieve the Refinancing after resolution of title defects affecting the Property, and pay a 100% dividend to unsecured creditors.  The Chapter 13 Trustee, however, recommended that the Court reduce Attorney Baker's compensation for all time billed in excess of $200 per hour and disallow fees of $8,514.50, in connection with the 2002 Case.  The Chapter 13 Trustee made no recommendation with respect to $3,954 charged by Debtor's Counsel for prosecution of the Appeal in the 2002 Case.

The United States Trustee (the "UST") also filed a Response to the Baker Application.  An attorney from the UST's office interviewed Debtor's Counsel and, with his permission, also interviewed the Debtor in connection with the Baker Application. Based upon these interviews, the UST concluded that Debtor's Counsel had an economic conflict of interest with the Debtor which he did not adequately explain to her. Notwithstanding this failure, the UST reported that the Debtor strongly supports the Baker Application and that she has agreed to waive any conflict of interest on a *post facto* basis. The UST recommended disapproval of all fees in excess of the $200 hourly rate and disallowance of $8,514.50 for work performed by Debtor's Counsel in the 2002 Case.  The UST made no recommendation with respect to the $3,954 charged by Debtor's Counsel for prosecution of the Appeal in the 2002 Case.[26]

---

[26] The recommendations of the Chapter 13 Trustee and the UST would result in payment of $3,500, inclusive of the filing fee, for the Debtors's 2002 Case based on the amounts Debtor's Counsel has received.

25

J. <u>The Present Procedural Posture</u>

On May 17, 2007, the Court conducted a hearing with respect to the Ablitt and Shapiro Applications, the Mortgagee's Statement of Advances, the Motion to Approve Disbursement, the Debtor's "Motion for Approval of Amended Plan," and EMC's Limited Objection to Confirmation of the Debtor's Third Amended Chapter 13 Plan (erroneously captioned "Debtor's Second Amended Pre-Confirmation Chapter 13 Plan"), which was filed on February 20, 2007. At the hearing, Debtor's Counsel requested additional time to comment upon the Shapiro and Ablitt Applications and to submit further objections to them, a request the Court granted, giving Debtor's Counsel until May 31, 2007 to file his responses.[27]

The Court treated the Mortgagee's Statement of Advances as a Motion for Determination of Secured Claims pursuant to 11 U.S.C. § 506. The Court approved the motion, finding the amounts sought "proper and reasonable under the Note and Mortgage." To the extent the Court's order approved the attorneys' fees requested in the Shapiro and Ablitt Applications, which were included in the Mortgagee's Statement of Advances, the Court reconsiders that order, in part, in this Memorandum with respect to the reasonableness of the fees and costs requested.

At the May 17, 2007 hearing, the Court also granted the Motion to Approve

---

[27] The Debtor sought an extension of this deadline one week after it expired on June 6, 2007.

26

Disbursement,[28] ordered the UST or the Chapter 13 Trustee to file a statement regarding

the Shapiro and Ablitt Applications by May 31, 2007, and continued the Debtor's Motion

for Approval of Amended Plan and EMC's Limited Objection to Confirmation generally.

The UST did not submit any comments regarding the Shapiro and Ablitt Applications; the

Chapter 13 Trustee filed statements on May 21, 2007 in which she represented that she had

no objections to them.

K. <u>EMC's Motion to Dismiss the Debtor's Complaint</u>

On March 9, 2007, EMC filed its Motion to Dismiss the Debtor's Complaint in the

EMC Adversary Proceeding.  It asserted that the Complaint failed to state a claim because

the Debtor's counts based upon RESPA and FDCPA are preempted by the Bankruptcy

Code and because its motions for relief did not violate the automatic stay.  The Debtor filed

an Objection to the Motion to Dismiss on April 10, 2007.  The Court took the matter under

advisement following a hearing on the matter on April 19, 2007.

**III. DISCUSSION**

A. <u>General Observations</u>

1. Practical Considerations

The Court is compelled to begin its discussion with some general observations about

the Pending Case that are pertinent to determination of the Applications before it.  In the

first place, this was neither a complex nor especially difficult case.  The Debtor's income

---

[28] Notwithstanding approval of that motion, the Court will consider herein whether any of the disputed amounts owed to EMC, namely the approximately $25,000 in fees and costs, should be remitted to the Debtor.

was sufficient to fund a meaningful plan, and her secured and unsecured debt was manageable.  To review, the Debtor disclosed in amended Schedules I and J filed on March 22, 2005, that her monthly income was $3,401 and her monthly expenses were $1,462, leaving her with monthly net disposable income of $1,939, excluding payment of her mortgage.  Assuming that the Debtor had elected to make her regular monthly mortgage payments directly to EMC in accordance with 11 U.S.C. §§ 1322(b)(2) and  1322(b)(5), she would have still have had $1,369 per month to fund a Chapter 13 Plan.  Moreover, the Debtor's failure to consistently make her monthly plan payments to the Chapter 13 Trustee during the Pending Case compounded the legal fees and costs she incurred because of EMC's decisions to file motions for relief from the automatic stay, as well as its need to respond to the Debtor's Pre-Confirmation Plans and other pleadings.  It also increased the commission payable to the Chapter 13 Trustee because the Debtor's plan payment included the amount of her monthly Mortgage payment.  *See* 28 U.S.C. § 586(e)(2).

The Debtor owed EMC *at most* $43,354.95 in prepetition mortgage arrearages at the commencement of the Pending Case.  She also owed $13,903.29 in priority tax claims and $9,356.70 in unsecured tax claims.  Had the Debtor proposed a 54 month plan she could have paid all claims in full.  Moreover, had the Debtor complied with the Massachusetts Local Bankruptcy Rules, Appendix 1, Rule 13-13(b) and filed a timely objection to EMC's proof of claim, specifically its prepetition arrearage claim, Debtor's Counsel could have avoided protracted and unproductive litigation that may not have been in the Debtor's best interest and certainly has not been in *his* best economic interest as the remainder of this

28

decision will show.  Any evaluation of the Baker Application and the Shapiro and Ablitt

Applications must be reviewed in this light.

Debtor's Counsel's services in obtaining a reverse mortgage for the Debtor, in and

of itself, cannot be considered a good result warranting full compensation, absent

substantial justification for failure to obtain confirmation of a plan after 34 months in this

Chapter 13, not to mention the Debtor's five previous bankruptcy cases, justification which

is not present in this case.  This is so because Debtor's counsel has incurred, by his

calculations, $31,042.50 in legal fees and expenses to challenge prepetition arrearages which

mushroomed from $18,119.68 at the commencement of the 2002 Case to $43,354.95 at the

commencement of the Pending Case, *and* the Debtor incrred closing costs of $9,073.50 in

conjunction with the Refinancing.  Though the reverse mortgage may have assisted the

Debtor in resolving her financial problems, it appears that it was not contemplated at the

commencement of the Pending Case, although the Debtor was eligible for a reverse

mortgage and was receiving Social Security retirement income at the time.[29]  Thus, the

results do not justify the lengthy delay in procuring the Refinancing and the extraordinary

fees associated with Debtor's Counsel's management of the 2002 Case and the Pending

Case.[30]

---

[29] The Court notes that the exhibit attached to the Refinancing Motion establishes
that she was over 62 years of age at the time she filed her sixth bankruptcy petition.

[30] A second observation also is warranted. Failure to abide by Court orders and
sloppy pleading permeate this Chapter 13 case.  Moreover, in view of the provisions of
28 U.S.C. § 586(a)(3), the Court is compelled to observe that both UST and the Chapter
13 Trustee should have responded to the Baker Application which contained Debtor's

2. Preliminary Matters - -Reconsideration of the EMC Claim Pursuant to 11 U.S.C. § 502(j)

a.  Applicable Law

Section 502(a) provides in relevant part that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  The burden is on a party who objects to the proof of claim to come forward with evidence to overcome the prima facie validity of the claim.  Fed. R. Bankr. P. 3001(f). Although Fed. R. Bankr. P. 3007 contains no time period for objecting to claims, in this jurisdiction, objections to claims must be filed with the Court within thirty days after the deadline for filing proofs of claim pursuant to Massachusetts Local Bankruptcy Rule Appendix 1, Rule 13-13(b).  A claim that has been allowed or disallowed may be reconsidered for cause and "allowed or disallowed according to the equities of the case."  11 U.S.C. § 502(j). "Reconsideration of both allowed and disallowed claims may occur at any time before a case is closed, but in such reconsideration the court must weigh the extent and reasonableness of any delay, or prejudice to any party in interest, the effect on efficient court administration and the moving party's good faith." Orsini Santos v. Lugo Mender (In re Orsini Santos), 349 B.R. 762, 769 (B.A.P. 1st Cir. 2006)(citing Fryer v. Easy Money Title Pawn, Inc. (In re Fryer), 172 B.R. 1020, 1024 (Bankr. S.D. Ga. 1994)).

b. Analysis

As a threshold matter, the Debtor's inferential requests for reconsideration of EMC's

---

Counsel's request for compensation in both the 2002 Case and the Pending Case without the necessity of a Court order.

30

Claim are procedurally defective as she has not filed a motion for reconsideration pursuant

to 11 U.S.C. § 502(j) and Fed. R. Bankr. P. 3008. Moreover, in view of the Debtor's failure

to object to the EMC Claim within the time set by the Local Rules, as well as within the time

established by the Court, the doctrine of laches could be invoked to bar the Debtor from

objecting to the EMC Claim and other fees and charges incurred by EMC as a result of the

Refinancing. In other words, the doctrine of laches could bar the Debtor from what in this

case is a "third bite of the apple." *See* Iglesias v. Mutual Life Ins. Co. of New York, 156 F.3d

237, 243 (1st Cir. 1998), *cert. denied,* 528 U.S. 812 (1999) (the equitable doctrine of laches

allows a court to dismiss a claim where a party's delay in bringing suit was unreasonable

and resulted in prejudice to the opposing party).

The Debtor's assertion that there "was no point to objecting to EMC's claim prior

to the time that payment of the claim in cash, instead of by foreclosure, became the reality,"

is contrary to the Local Rules, a direct order of this Court, and the Debtor's own adversary

proceeding against EMC. The "point" in requiring the Debtor to object to the EMC Claim

was to liquidate the amount due to the mortgagee expeditiously and to avoid undue delay

in the administration of this case.

Although the Debtor failed to properly seek reconsideration of the allowance of the

EMC Claim, the effect of the Court's order of January 12, 2007, which required the sum of

$25,000 to be held in escrow and which also required EMC to provide the Debtor with an

itemization of attorneys' fees and costs, was tantamount to reconsideration of the disputed

portion of the EMC Claim in addition to an independent assessment of the reasonableness

31

of the fees, costs and charges incurred by EMC.

B. The Applications

1. The EMC Applications

The Debtor objected to the Shapiro and Ablitt Applications alleging duplication of services, double billing, excessive charges and attempted collection of postpetition amounts in violation of the automatic stay.  She asserted that there is a disparity among the amounts requested in the Shapiro and Ablitt Applications, and the amounts set forth in the EMC Claim, the Mortgagee's Statement of Advances and a recent pay-off letter issued by EMC. The Debtor also contended that Section 7 of the Mortgage is ambiguous as to the allowance of attorneys' fees and should be construed against EMC, citing In re Romano, 174 B.R. 342 (Bankr. M.D. Fla. 1994).

In response, EMC maintained that a majority of the amounts sought in its Applications was included in the EMC Claim and that the Debtor should be barred from objecting to those amounts because of her failure to object to the EMC Claim.  The Court, however, cannot reconcile the amounts set forth in the Shapiro and Ablitt Applications with those detailed in the EMC Claim.   Thus, the Court will evaluate the Shapiro and Ablitt Applications on their merits without regard to the amounts set forth in the EMC Claim and without regard to Debtor's Counsel's representations that a pay-off letter with different figures was given to him.[31]

---

[31] The Debtor failed to attach a copy of the payoff letter to any of her pleadings.

Pursuant to 11 U.S.C. § 506(b),[32] a creditor may recover "fees, costs, or charges" if the creditor can demonstrate that: (1) the creditor is oversecured, meaning that the value of the property securing the claim is greater that the amount of the claim; (2) the agreement giving rise to the claim provides for attorneys' fees, costs, or charges; and (3) the fees, costs, or charges are reasonable.  There is no dispute between the parties that EMC is oversecured as the value of the Debtor's Property ($325,000 at the time of the Refinancing) is greater than the amount of EMC's claim ($126,269.97 as set forth on the HUD Settlement Statement attached to the Report).  There is also no dispute that the Mortgage provides for the recovery of collection costs and attorneys' fees, although the Debtor asserted that Section 7 of the Mortgage, which is reproduced above, is ambiguous.

As a preliminary matter, the Court rejects the Debtor's argument that Section 7 is ambiguous.  The Court finds no ambiguity; the language in the Mortgage is plain.  The Court is not persuaded by the holding of In re Romano, 174 B.R. 342 (Bankr. M.D. Fla. 1994), the case upon which the Debtor relied for the proposition that Section 7 is ambiguous.  In that  case, the court ruled that an attorneys' fee clause nearly identical to

---

[32] Section 506(b) was amended by BAPCPA.  The provisions of the statute in effect on the petition date provided in relevant part:

> To the extent that an allowed secured claim is secured by property the value of which,. . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

33

Section 7 of the Mortgage was inherently ambiguous and construed it against the mortgagee. In <u>Romano</u>, Chapter 13 debtors objected to more than $8,300 in attorneys' fees and costs charged by their mortgagee in what the court characterized as a "straightforward Chapter 13 case, in which the creditor's attorneys did nothing more than file a proof of claim, file a motion for adequate protection, and object to the plan." 174 B.R. at 345 n. 2. To repeat, this Court finds nothing ambiguous about the language of Section 7 of the Mortgage which provides that "the Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property."

The Court finds that the fees and costs charged by EMC and Washington Mutual resulted from actions which were necessary to protect their interests in the Property and that the services for which they seek compensation were far more extensive than those performed by the creditor's counsel in <u>Romano</u>. Indeed, $5,454.42 of the $6,407.92 sought in the Shapiro Application is for reimbursement of foreclosure costs which directly related to the preservation of EMC's rights in the Property. A majority of time billed in the Ablitt Application relates to matters initiated by the Debtor such as the Appeal, the Debtor's objection to EMC's proof of claim in the 2002 Case, and multiple confirmation objections filed in response to the Debtor's various Chapter 13 Plans in the Pending Case, all of which contained some language purporting to affect EMC's rights in the Property. Thus, the sole remaining question is whether the amounts requested in the applications are reasonable.

a. The Shapiro Application

As discussed above, Shapiro & Kreisman acted primarily as foreclosure counsel to

34

Washington Mutual and Ablitt & Charlton acted as bankruptcy counsel to EMC.   The Debtor alleged that there was unnecessary overlap of services performed by the two firms because they both billed for services performed between May of 2003 and October of 2004. While both firms did bill for services during that period, even a cursory review of the time sheets submitted by Shapiro & Kreisman demonstrates that it performed services related to the foreclosure proceedings which differ from the general bankruptcy work performed by Ablitt & Charlton for the same time period.  In the absence of any specific duplication of services identified by the Debtor, the Court rejects the Debtor's vague allegations of double billing.

The Debtor also objected to a number of foreclosure related costs, such as auctioneer fees and publication costs as being excessive or unnecessary.  The Court has reviewed these charges with the supporting invoices provided by Shapiro & Kreisman and finds the charges to be reasonable, allowable under the Mortgage, traceable to the Property, and consistent with a mortgagee's duty to act in good faith and to use reasonable diligence in conducting a foreclosure sale.  *See* Mass. Gen. Laws ch. 244 §§ 11-17B; *see also* Nat'l Loan Investors, LP v. LaPointe (In re LaPointe), 253 B.R. 496, 499-500 (B.A.P. 1st Cir. 2000).  The Court notes that the Debtor's serial bankruptcy filings necessitated the cancellation of at least two scheduled foreclosure auctions of the Property, circumstances which added to the foreclosure costs the Debtor now argues are excessive.  The Court shall enter an order overruling the Debtor's objection to the Shapiro Application in its entirety and awarding Shapiro & Kreisman $953.50 in fees and $5,454.42 in costs for a total award of $6,407.92.

35

b.  The Ablitt Application

The Debtor objected to the sum of $6,601.50 billed by Ablitt & Charlton in connection with the Appeal in the 2002 Case because the Appeal Stipulation provided that EMC would not seek recovery of costs related to the Appeal.  The Debtor relied on Local Rule 39 of the United States Court of Appeals for the First Circuit.  Currently, there is no First Circuit Local Rule 39.[33]  The Court presumes that the Debtor intended to reference and rely upon Fed. R. App. P. 39(a)(1) which provides, in part: "(1) if an appeal is dismissed, costs are taxed against the appellant, unless the parties agree otherwise."  On its face, this rule appears to relate only to "costs" associated with appeals.  The Debtor has provided no specific authority to extend application of this rule to attorneys' fees incurred in connection with an appeal, and the Appeal Stipulation is silent about attorneys' fees.  Accordingly, the Court finds that the Stipulation does not preclude the award of attorneys' fees sought by EMC and Ablitt & Charlton in connection with the Appeal.[34]

The Debtor also maintained, without any foundation, that time spent by EMC's counsel at various hearings and on other matters "seemed excessive."  The Court is unpersuaded by the Debtor's conjecture and finds the amounts requested in the Ablitt Application to be appropriate and reasonable in view of the protracted nature of these proceedings.  The Court shall enter an order overruling the Debtor's objection to the Ablitt

[33] There is, however, a current First Circuit  Local Rule 39.0, effective as of April 20, 2007, which is entitled "Taxation of Reproduction Costs."

[34] None of the costs requested in the Ablitt Application appear to relate to the Appeal.

36

Application in its entirety and awarding Ablitt & Charlton $10,390.50 in fees and $300 in

costs.  As a result, no amounts received by EMC from the Refinancing need be remitted to

the Debtor, and EMC may pay Shapiro & Kreisman and Ablitt & Charlton fees in amounts

which are consistent with the Court's rulings.

2. The Baker Application

a. Positions of the Parties

Debtor's Counsel asserted that the amounts sought in his Application are reasonable

because, though protracted, the Debtor's 2002 Case and the Pending Case have achieved

a favorable result, namely the consummation of the reverse mortgage transaction and the

payment of a 100% dividend to unsecured creditors.  Debtor's Counsel recounted his

prosecution of the various appeals and adversary proceedings in both Chapter 13 cases,

the continuing dispute with EMC, and his resolution of certain title defects affecting the

Property.  He argued that he should not be constrained by the hourly rate disclosed in the

2016(b) Statement because the services which he was required to undertake in the 2002

Case and the Pending Case were not reasonably within the contemplation of the parties

and because general economic inflation warrants an increase in the billable rate charged.[35]

Lastly, Debtor's Counsel defended the allegation that he had a conflict of interest with the

Debtor at the time of the commencement of the Pending Case because of unpaid fees for

services performed in the 2002 Case by claiming that his interests did not impair his

---

[35] In his response to the Chapter 13 Trustee's objection to his application,
Debtor's Counsel supplied a link to the United States Bureau of Labor Statistics' website
and its inflation calculator.

independent professional judgment.  Debtor's Counsel cited <u>In re Gutierrez</u>, 309 B.R. 488 (Bankr. W.D. Tex. 2004), in support of his position.

The Chapter 13 Trustee contended that Debtor's Counsel was a creditor of the Debtor in the Pending Case with respect to amounts owed for work performed in the 2002 Case and had, at most, a general unsecured claim for those fees in the Pending Case.  She added that his status as a prepetition creditor created a conflict of interest in his representation of the Debtor in the Pending Case.   The UST generally concurred, contending that fees owed to Debtor's Counsel for the 2002 Case constitute a prepetition unsecured claim against the Debtor in the Pending Case for which there is no basis for allowance under 11 U.S.C. § 330(a)(4)(B).  Both the Chapter 13 Trustee and the UST also recommended reduction of the Baker Application for all amounts billed in excess of the billable rate disclosed in the Rule 2016(b) Statement.

b. Applicable Law

As a threshold matter, attorneys representing Chapter 13 debtors are not bound by 11 U.S.C. § 327(a).  They are paid, however, out of property of the estate.  *See* 11 U.S.C. § 1306.[36]  Moreover, pursuant to § 330(a)(4)(B) of the Bankruptcy Code, "the court may allow

---

[36] In <u>In re Gutierrez</u>, 309 B.R. 488 (Bankr. W.D. Tex. 2004), the court observed:

It is usually out of this additional tranche of property that the debtor's lawyer in a chapter 13 case is paid, and usually out of the first 12 to 24 payments, as a priority claim. If unsecured creditors are paid less than 100%, they are certainly, as a matter of economics, funding the debtor's lawyer out of property that would otherwise be distributed to them. *See* 11 U.S.C. § 1325(b) (on objection of an unsecured creditor, plan must devote all of debtor's net disposable income over three year period to payment of

reasonable compensation to the debtor's attorney for representing the interests of the

debtor in connection with the bankruptcy case based on a consideration of the benefit and

necessity of such services to the debtor and the other factors set forth in this section [§

330(a)(3)]."  11 U.S.C. § 330(a)(4)(B).

In assessing what constitutes "reasonable compensation," § 330(a)(4)(B) specifically

directs the Court's attention to the welfare of the debtor rather than the bankruptcy estate.

To determine the amount of reasonable compensation to be awarded, the Court is to

consider the nature, the extent, and the value of such services, taking into account all

relevant factors, including -

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

---

creditor claims).  309 B.R. at 500 n. 27.  In this case, Attorney Baker seeks payment from the proceeds of the Refinancing of the Debtor's Property, which is property of the estate.

11 U.S.C. § 330(a)(3).[37]   Some courts assess reasonableness by conflating a pending case

with a prior case.  In <u>Gutierrez</u>, the court considered and rejected the Chapter 13 trustee's

argument that the debtor's second case was a continuation of the first and her attorney

"should not be able to profit by the debtor's inability to 'do it right' the first time,'"'

although it recognized that there was some support for the conflation theory.  309 B.R. at

495-96 (citing <u>In re Thomas</u>, 123 B.R. 552, 554-55 (Bankr. W.D. Tex. 1991).  The court

concluded:

> The right place to apply this conflation argument, if it is to be applied at all,
> is in the evaluation of what ought to be awarded as a reasonable fee in the
> *new* case, not as a *post hoc* factor to reduce the claim for unpaid fees from the
> previous case. The claim for fees left unpaid from the previous case can only
> be reduced to the extent that the fees sought are found not to be
> "reasonable," and that evaluation can only be applied to the services for
> which those fees were charged-the work done for the previous case.

<u>Id.</u> at 496 (emphasis in original).[38]  This Court rejects the conflation theory.  While it may

have some superficial appeal, there simply is no support for it under the Bankruptcy Code

or Rules.

    Although the Debtor did not object to the Baker Application and, in fact, supports

the application, "the court has an independent judicial responsibility to evaluate attorneys'

fees," even in the absence of objections.  *See* <u>In re First Software, Corp.</u>, 79 B.R. 108, 111

---

[37] Section 330(a)(3) was amended by BAPCPA.  The provisions of the statute
quoted above were those in effect at the time the Debtor filed the Pending Case.

[38] Notably, in <u>Gutierrez</u>, debtor's counsel's fees had been allowed in the debtor's
prior case, and he filed a proof of claim.

(Bankr. D. Mass. 1987)(quoting <u>In re S.T.N. Enterprises, Inc.</u>, 70 B.R. 823, 831-32 (Bankr. D. Vt. 1987)).

### c. Analysis

#### i. The 2002 Case

The Court finds that Debtor's Counsel was a creditor of the Debtor at the commencement of the Pending Case for unpaid fees owed for the 2002 Case. Indeed, had counsel filed a proof of claim for those fees in the Pending Case, it would have been deemed allowed in the absence of an objection. *See* 11 U.S.C. § 502(a). Despite his creditor status, the Court is satisfied, based on the representations made by the UST, that any conflict of interest Debtor's Counsel had with the Debtor was subsequently waived by her. As the court in <u>Gutierrez</u> observed:

> A lawyer believing that [conflict of interest rules] may be implicated might, in an abundance of caution, want to put to rest any concerns about conflicts of interest and could easily obtain a written waiver laying out the relevant issues for the client, and maintain that waiver in its files. A 'belt and suspenders' lawyer might even attach such a consent form to its Rule 2016 disclosure.

309 B.R. at 499.

The Court must next determine whether Debtor's Counsel is entitled to compensation for work performed in the 2002 Case, and, if so, in what amount. Debtor's Counsel did not file a formal proof of claim in the Pending Case for his unpaid fees in the 2002 Case and is now time barred from doing so. *See* Fed. R. Bankr. P. 3002(c). The time for filing a proof of claim under Rule 3002(c) may not be enlarged except to the extent and under the conditions stated in the that rule. *See* Fed. R. Bankr. P. 9006(b). Additionally, the

41

Court cannot consider either the Baker Application or his 2016(b) Statement filed in the Pending Case as an informal proof of claim. Debtor's Counsel filed the Baker Application well after the claims bar date, and the Rule 2016(b) Statement does not contain a demand upon the Debtor's estate or an intent to hold the Debtor liable for the debt. *See* <u>In re Wigoda</u>, 234 B.R. 413, 415 (Bankr. N.D. Ill. 1999), *aff'd* 11 Fed. Appx. 624 (7th Cir. 2001)("The informal proof of claim is an equitable doctrine developed by the courts to ameliorate the strict enforcement of the claims bar date. To be an informal proof of claim a document must (1) have been timely filed with the bankruptcy court and become part of the record, (2) state the existence and nature of the debt, (3) state the amount of the claim, and (4) evidence the creditor's intent to hold the debtor liable." (citations omitted)); <u>In re Bowers</u>, 104 B.R. 362, 364-65 (Bankr. D. Colo. 1989)(determination of whether an informal proof of claim exists requires that the proof of claim must be in writing; that the writing must contain a demand by the creditor on the debtor's estate; that the writing must express an intent to hold the debtor liable for the debt; that the proof of claim must be filed with the Bankruptcy Court; and that, based on the facts of the case, it would be equitable to allow the amendment.). *Cf.* <u>Liakas v. Creditors' Comm. of Deja Vu, Inc.</u>, 780 F.2d 176, 178 (1st Cir. 1986)("a proof of claim must contain a demand by the creditor against the debtor's estate, and an intent to hold the debtor's estate liable").

The only document filed by Debtor's Counsel prior to the deadline for filing proofs of claim in the Pending Case which suggests a balance owed for the 2002 Case is the "Chapter 13 Agreement between Debtor and Counsel" filed in the Pending Case. It,

however, does not contain a demand for payment or otherwise satisfy the requirements for

informal proofs of claim set forth in <u>Bowers</u> and <u>Wigoda</u>.  The Chapter 13 Agreement

reflects that counsel charged the Debtor $2,500 as an *initial* fee for the Pending Case.  As

noted above, it further reflects the following:

> . . .  Prior to filing the case, the debtor has given the attorney a check for
> $10,264.00 representing a refund from the Chapter 13 Trustee from the
> debtor's prior case.  The attorney *will* pay $5,000 to himself for the prior case
> *and* the present case. The balance shall pay the filing fee for this case and the
> remainder will be paid to Chapter 13 trustee for the present case. If the initial
> fees are not sufficient to compensate the attorney for the legal services
> rendered in *this* case, the attorney further agrees to apply to the court for
> additional fees where required by Local Rule.

(emphasis added).  The Court infers from this language that Debtor's Counsel obtained

$5,000[39] from the Debtor at the time he filed the Pending Case, $2,500 of which he used for

the payment of services to be performed in the Pending Case and $2,500 for services

performed in the 2002 Case.  The Chapter 13 Agreement reflects Debtor's Counsel's intent

to seek court approval for compensation in excess of $2,500 for the Pending Case.  In no

way, though, does the Chapter 13 Agreement constitute an informal proof of claim,

enabling Attorney Baker to amend it to seek additional compensation for services provided

to the Debtor in the 2002 Case.

Attorney Baker received payment of $3,315 for services in the 2002 Case ($1,000 paid

at the time of the filing of the 2002 Case, plus $2,500 paid on September 21, 2004  for the

---

[39] This amount is consistent with what the Debtor reported in her Statement of
Financial Affairs.  The Court is unaware of the sums remitted to the Chapter 13 Trustee,
if any, upon the commencement of the Pending Case.

2002 Case, for a total of $3,500, less the $185 filing fee for the 2002 Case). Accordingly, following the dismissal of the 2002 Case and prior to the filing of the Pending Case, Attorney Baker was paid $815 for the 2002 Case, which was unsupported by an application for compensation, outside the protection afforded by Massachusetts Local Bankruptcy Rules, Appendix 1, Rule 13-7(b) and (c), and not approved by the Court.

Because Attorney Baker did not file a proof of claim, and failed to seek Court authority for the payment of fees in excess of $2,500, the Court awards Debtor's Counsel the sum of $2,500 for services and $185 for expenses for the 2002 Case. The Court disallows fees in excess of that sum, including all sums related to the unsuccessful Appeal of the Court's order denying his Motion for Relief from Order Sustaining Objection to Confirmation as those services were of no benefit to the Debtor or her estate.

ii. The Pending Case

Based upon to the factors enumerated in § 330(a)(3), the Court finds that work performed by Debtor's Counsel in the Pending Case, specifically the Resource One Adversary Proceeding, did provide some substantive value to the Debtor who was able to avoid foreclosure and retain her home. Nevertheless, Debtor's Counsel, as discussed above in the section captioned "Practical Considerations," also performed work in this case which needlessly prolonged the proceedings and generated pointless litigation. Additionally, he repeatedly failed to abide by Court orders and engaged in activities of questionable value to the Debtor. The deficiencies in his representation of the Debtor include: 1) failure to object to the EMC Claim which would have promptly and efficiently

44

resolved the Debtor's countless objections to EMC's fees and avoided much of the litigation

that has been generated in this case;[40] 2) failure to comply with Court orders and to respect

deadlines, together with a concomitant disregard for applicable rules and procedures;[41] and

3) failure to attend the Refinancing closing and to otherwise assure compliance with the

Court's January 12, 2007 escrow order.  The Court also observes that Debtor's Counsel

appears to have failed to do any cost/benefit analysis with respect to the fees he was

incurring in relation to the EMC Claim.

The most egregious example of Debtor's Counsel's disregard for applicable law was

his receipt of fees from the Refinancing proceeds without prior Court approval and in

violation of substantive and procedural rules of the Bankruptcy Code applicable to

approval and payment of fees.   *See* 11 U.S.C. § 330; Fed. R. Bankr. P. 2016; and

Massachusetts Local Bankruptcy Rule, Appendix 1, Rule 13-7(b). The Debtor filed her

Refinancing Motion on December 5, 2006.  In that motion, Debtor's Counsel alluded to his

estimated fee of $25,000.  The Court scheduled the Refinancing Motion for hearing on

January 11, 2007 and, following Court approval on that date, the closing took place on

February 6, 2007.  Accordingly, Debtor's Counsel had two months within which to file a

fee application and obtain approval of his fees.  Alternatively, he could have sought a

---

[40] Not only did the Debtor fail to object to the EMC Claim in accordance with
Massachusetts Local Bankruptcy Rules, Appendix 1, Rule 13-13(b), she also failed to file
an objection by April 17, 2006 in accordance with the Court's order of March 16, 2006.

[41] For example, the Debtor failed to file a Fourth Amended Pre-Confirmation
Chapter 13 Plan by February 12, 2007 in accordance with the Court's order dated
January 11, 2007.  Instead, she filed the Plan on February 20, 2007.

mechanism, such as an escrow, pursuant to which his fees could have been segregated, pending the filing of a fee application and a Court order with respect to compensation. Instead, after the closing, he filed the Report, disclosing that he had been paid $25,000. The Report precipitated this Court's order to file a fee application.[42] Because Debtor's Counsel is an experienced bankruptcy practitioner and is presumed to be aware of the disclosure and notice requirements governing fees in excess of $2,500 in Chapter 13 cases, the Court can only conclude that he chose to ignore those requirements. *Cf* <u>Miller v. Peterson (In re Indep. Eng'g Co., Inc.)</u>, 197 F.3d 13 (1st Cir. 1999).

In the Pending Case, Debtor's Counsel sought payment for 42.6 hours of work. In addition to the concerns noted above, the Court finds that the time spent was excessive in view of the ministerial nature of some of the services and reduces the number of hours for which Attorney Baker can be compensated by 1.6. Moreover, because Attorney Baker did not supplement his Rule 2016(b) Statement, the Court finds that he cannot be compensated at an hourly rate in excess of $200. The Court rejects Debtor's Counsel's argument that general economic conditions warrant the undisclosed increase in his hourly rates. *See* Fed. R. Bankr. P. 2016(b) which states, in part: "A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed." Accordingly, the Court finds that Attorney Baker is entitled to

---

[42] Debtor's Counsel was ordered to file an application for compensation by February 27, 2007. He sought an extension of time to file the application. The Court granted the extension request and gave Debtor's Counsel until March 8, 2007 to file his application. He did not do so until March 9, 2007.

46

interim compensation in the total amount of $8,200 for the Pending Case plus reimbursement for expenses in the sum of $194.

With respect to Attorney Baker's request for fees in the Resource One Adversary Proceeding, the Court finds that he is entitled to compensation for his hours which totaled 15.3.  At the hourly rate of $200, Attorney Baker is entitled to compensation in the sum of $3,060 for service performed in that adversary proceeding.

With respect to the EMC Adversary Proceeding, the Court shall defer any fee award at this time.  In view of the Court's rulings with respect to the Motion to Dismiss, an award of fees is premature at this time.

### d. Summary

In summary, the Court awards Debtor's Counsel total interim compensation of $11,454 for the Pending Case, plus $2,685 for the 2002 Case, for a total award of $14,139. Because Debtor's Counsel has been paid $31,000, comprised of $6,000 ($1,000 at the commencement of the 2002 Case and $5,000 on September 21, 2004) and  $25,000 from the Refinancing, the Court finds that Debtor's Counsel must disgorge the sum of $14,361 to the Debtor.  In addition, Debtor's Counsel shall remit $2,500 to the Chapter 13 Trustee who shall hold that amount in an interest bearing escrow account pending further orders of this Court with respect to any additional fees that it may award Attorney Baker for the Pending Case and the EMC Adversary Proceeding.

C. <u>The Motion to Dismiss</u>

    1.  Positions of the Parties

        a. EMC

EMC moved to dismiss this adversary proceeding on numerous grounds.  Relying on <u>Ameriquest Mortgage Co. v. Nosek (In re Nosek)</u>, 354 B.R. 331 (D. Mass. 2006), it argued that all the Debtor's claims are based upon its purported violation of RESPA and that those claims are preempted by the Bankruptcy Code.[43]  EMC also argued that <u>Nosek</u> requires this Court to conclude that the Bankruptcy Code preempts the Debtor's FDCPA claims, as the remedial schemes of the two statutes conflict, and, therefore, the Bankruptcy Code must trump the FDCPA in bankruptcy proceedings.   In the alternative, EMC argued that the Debtor's FDCPA claims are barred by the one year statute of limitations, *see* 15 U.S.C. § 1692k(d), as both the EMC Claim and the August 10th Motion were filed over one year prior to the November 21, 2006 filing of the EMC Adversary Proceeding.  While any claims based on the  October 5th Motion may be timely, EMC added that the decision in <u>Rice-Etherly v. Bank One, N.A. (In re Rice-Etherly)</u>, 336 B.R. 308 (Bankr. E.D. Mich. 2006), requires dismissal because an independent cause of action under the FDCPA arising from the inclusion of attorneys' fees in a motion for relief from the automatic stay is an example

---

[43]"Count I - Violation of the Servicer Act," "Count II - Breach of Contract," and "Count V - Declaration and Redemption" are all based upon the alleged failure of EMC to respond to the Debtor's "qualified written request" for a payoff figure.  Count I alleges a violation of 12 U.S.C. § 2605(e)(1)(B)(2), while Count II is an alternative state law claim.  Count V seeks a declaration of the amount owed based on the controversy created by the RESPA request and attorneys' fees.

of "the practice of debtors deliberately bypassing the Bankruptcy Code's objection process in favor [of] alternative litigation [which] would undermine the entire bankruptcy system." Id. at 312-13.

EMC also contended that the filing of its motions for relief from stay did not, in and of themselves, violate the automatic stay. EMC asserted that the "enumerated fees" contained in those motions, which the Debtor now challenges, were merely estimated expenses which might have been incurred in the event of a future foreclosure. EMC argued that the mere enumeration of such estimated fees and costs in a motion for relief from stay filed with the Court does not violate the stay. Moreover, because the August 10th Motion was denied, the October 5th Motion was withdrawn, and EMC has been paid in full through the Refinancing, EMC argued that the determination of any future foreclosure fees and costs is moot.

### b. The Debtor

The Debtor objected to the Motion to Dismiss, arguing that preemption is not an issue in this case. The Debtor posited that cases finding preemption of non-bankruptcy federal law by the Bankruptcy Code misinterpret the doctrine of preemption because the Supremacy Clause of the United States Constitution is not implicated. According to the Debtor, preemption is not implicated unless there is a conflict between state and federal law. Citing Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co., __ U.S. __, 127 S.Ct. 1199 (2007), F.C.C. v. NextWave Personal Comm'ns Inc., 537 U.S. 293 (2003), and Patterson v. Shumate, 504 U.S. 753 (1992), the Debtor asserted that the Supreme Court has

49

repeatedly held that bankruptcy law and non-bankruptcy federal law can co-exist.

With regard to Nosek, the Debtor asserted that the district court misinterpreted the decision in Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439 (1st Cir. 2000), *cert. denied*, 532 U.S. 1048 (2001), a case in which the United Stated Court of Appeals for the First Circuit held that the bankruptcy court's contempt authority under 11 U.S.C. § 105 preempted resort to state law for violations of the discharge injunction because a full remedy was available under the Bankruptcy Code. The Debtor added that the court in Nosek failed to consider the clear provisions of 11 U.S.C. § 1322(e), which explicitly incorporate non-bankruptcy law and the underlying contract in determining the amount necessary to cure a default.

The Debtor also relied upon Randolph v. IMBS, Inc., 368 F.3d 726 (7th Cir. 2004), for the proposition that RESPA and the FDCPA are not preempted by the Bankruptcy Code and serve as alternative sources of liability. Moreover, she contended that the EMC Claim and the August 10th Motion, which were filed more than one year prior to the filing of the adversary proceeding, are part of a series of communications constituting a continuing violation of the FDCPA and thus are not barred by the one-year statute of limitations applicable to that statute. *See* 15 U.S.C. § 1692k(d); Kaplan v. Assetcare, Inc., 88 F.Supp.2d 1355, 1360 (S.D. Fla. 2000).

Although the Debtor did not address the alleged violation of the automatic stay in her Objection to the Motion to Dismiss, at the April 19, 2007 hearing, Debtor's Counsel referred the Court to a decision from another jurisdiction, In re Sullivan, No. 03-65486, 2007

50

WL 987328 (Bankr. N.D.N.Y. Apr. 2, 2007), representing that it was "factually very similar."

2.  The Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

Two months ago, the United States Supreme Court issued a decision in an antitrust case which implicates the standard for dismissal under Fed. R. Civ. P. 12(b)(6), made applicable to the Debtor's Complaint by Fed. R. Bankr. P. 7012.  In Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955 (2007), the Court seemingly modified the time-honored standard for dismissal set forth in Conley v. Gibson, 355 U.S. 41, 47 (1957), replacing that decision's "no set of facts" language for a "plausibility" standard with respect to notice pleading in complaints.  In other words, according to the Supreme Court in Bell Atlantic, a court should not dismiss a complaint if there are "enough facts to state a claim to relief that is plausible on its face," 127 S.Ct. at 1974, or if the plaintiff has demonstrated a "reasonably founded hope that the [discovery] process will reveal relevant evidence" to support his or her claims.  Id. at 1967.  As noted by the Court in Iqbal v. Hasty, __ F.3d __, No. 05-5768-CV, 2007 WL 1717803 (2nd Cir. June 14, 2007), however, "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings has . . . been created by the Supreme Court's decision. . . ." 2007 WL at 1717803 at *8.  It observed the following:

> If we were to consider only a narrow view of the holding of that decision, we would not make any adjustment in our view of the applicable pleading standard.  Bell Atlantic held that an allegation of parallel conduct by competitors, without more, does not suffice to plead an antitrust violation under 15 U.S.C. § 1. See id. at 1961. The Court required, in addition, "enough factual matter (taken as true) to suggest that an agreement was made." Id. at 1965. However, the Court's explanation for its holding indicated that it intended to make some alteration in the regime of pure notice pleading that

51

had prevailed in the federal courts ever since <u>Conley v. Gibson</u>, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), was decided half a century ago. The nature and extent of that alteration is not clear because the Court's explanation contains several, not entirely consistent, signals, which we consider (not necessarily in the order set forth in the Court's opinion).

Some of these signals point toward a new and heightened pleading standard. First, the Court explicitly disavowed the oft-quoted statement in <u>Conley</u> of " 'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Bell Atlantic</u>, 127 S.Ct. at 1968 (quoting <u>Conley</u>, 355 U.S. at 45-46). <u>Bell Atlantic</u> asserted that this "no set of facts" language "has earned its retirement" and "is best forgotten." <u>Id.</u> at 1969.

Second, the Court, using a variety of phrases, indicated that more than notice of a claim is needed to allege a section 1 violation based on competitors' parallel conduct. For example, the Court required "enough factual matter (taken as true) to suggest that an agreement was made," <u>id.</u> at 1965; "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," <u>id.</u>; "facts that are suggestive enough to render a § 1 conspiracy plausible," <u>id.</u>; "allegations of parallel conduct . . . placed in a context that raises a suggestion of a preceding agreement," <u>id.</u> at 1966; "allegations plausibly suggesting (not merely consistent with) agreement," <u>id.</u>; a "plain statement" (as specified in Rule 8(a)(2)) with "enough heft" to show entitlement to relief, <u>id.</u>; and "enough facts to state a claim to relief that is plausible on its face," <u>id.</u> at 1974, and also stated that the line "between the factually neutral and the factually suggestive . . . must be crossed to enter the realm of plausible liability," <u>id.</u> at 1966 n. 5, and that "the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible," <u>id.</u> at 1973 n. 14.

Third, the Court discounted the ability of "'careful case management,'" "to weed[ ] out early in the discovery process" "a claim just shy of a plausible entitlement." <u>Id.</u> at 1967 (quoting <u>id.</u> at 1975 (Stevens, J., dissenting)).

Fourth, the Court encapsulated its various formulations of what is required into what it labeled "the plausibility standard." <u>Id.</u> at 1968. Indeed, the Court used the word "plausibility" or an adjectival or adverbial form of the word fifteen times (not counting quotations).

On the other hand, some of the Court's linguistic signals point away from a

heightened pleading standard and suggest that whatever the Court is requiring in <u>Bell Atlantic</u> might be limited to, or at least applied most rigorously in, the context of either all section 1 allegations or perhaps only those section 1 allegations relying on competitors' parallel conduct. First, the Court explicitly disclaimed that it was "requir[ing] heightened fact pleading of specifics," <u>id.</u> at 1974, and emphasized the continued viability of <u>Swierkiewicz</u>, *see* <u>id.</u> at 1973-74, which had rejected a heightened pleading standard. *See also* <u>Erickson v. Pardus</u>, __ U.S.__, 127 S.Ct. 2197, 2200, __ L.Ed.2d __ (2007) (citing <u>Bell Atlantic's</u> citation of <u>Swierkiewicz</u> ).

Second, although the Court faulted the plaintiffs' complaint for alleging "merely legal conclusions" of conspiracy, <u>Bell Atlantic</u>, 127 S.Ct. at 1970, it explicitly noted with approval Form 9 of the Federal Civil Rules, Complaint for Negligence, which, with respect to the ground of liability, alleges only that the defendant "negligently drove a motor vehicle against plaintiff who was then crossing [an identified] highway," Fed.R.Civ.P.App. Form 9. *See* <u>Bell Atlantic</u>, 127 S.Ct. at 1970 n. 10. The Court noted that Form 9 specifies the particular highway the plaintiff was crossing and the date and time of the accident, *see* <u>id.</u>, but took no notice of the total lack of an allegation of the respects in which the defendant is alleged to have been negligent, i.e., driving too fast, crossing the center line, running a traffic light or stop sign, or even generally failing to maintain a proper lookout. The adequacy of a generalized allegation of negligence in the approved Form 9 seems to weigh heavily against reading <u>Bell Atlantic</u> to condemn the insufficiency of all legal conclusions in a pleading, as long as the defendant is given notice of the date, time, and place where the legally vulnerable conduct occurred.

Third, the Court placed heavy emphasis on the "sprawling, costly, and hugely time-consuming" discovery that would ensue in permitting a bare allegation of an antitrust conspiracy to survive a motion to dismiss, *see* <u>id.</u> at 1967 n. 6, and expressed concern that such discovery "will push cost-conscious defendants to settle even anemic cases," <u>id.</u> at 1967. These concerns provide some basis for believing that whatever adjustment in pleading standards results from <u>Bell Atlantic</u> is limited to cases where massive discovery is likely to create unacceptable settlement pressures.

Fourth, although the Court expressed doubts about the ability of district courts to "weed[ ] out" through case management in the discovery process "a claim just shy of a plausible entitlement to relief," <u>id.</u> (emphasis added), the Court did not disclaim its prior statement that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." <u>Leatherman</u>, 507 U.S. at

168-69 (emphasis added). Leaving <u>Leatherman</u> and <u>Crawford-El</u> undisturbed (compared to the explicit disavowal of the "no set of facts" language of Conley ) further suggests that <u>Bell Atlantic</u>, or at least its full force, is limited to the antitrust context.

Fifth, just two weeks after issuing its opinion in <u>Bell Atlantic</u>, the Court cited it for the traditional proposition that "[s]pecific facts are not necessary [for a pleading that satisfies Rule 8(a)(2) ]; the statement need only '"give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Erickson</u>, 127 S.Ct. at 2200 (quoting <u>Bell Atlantic</u>'s quotation from <u>Conley</u>) (omission in original).

2007 WL 1717803 at *8-*10. Based upon those thoughtful observations, the Second Circuit concluded: "we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." 2007 WL at 1717803 at *11.

In this Court's view, the standard articulated by the Second Circuit - - "a flexible 'plausibility standard'" - - is warranted and appropriately applied to the Debtor's Complaint against EMC. Applying that standard, the Court shall dismiss Counts II through V of the Debtor's Complaint and require the Debtor to forthwith amend Count I. For the reasons set forth below, the Court finds that Counts II through V are implausible on their face and do not merit further discovery or consideration by this Court.

3. Count I - Violation of the Servicer Act

a. Applicable Law

This Court has examined the provisions of RESPA in several Chapter 13 cases. In <u>Maxwell v. Fairbanks Capital Corp. (In re Maxwell)</u>, 281 B.R. 101 (Bankr. D. Mass. 2002),

54

this Court stated the following:

> Congress enacted RESPA in response to its finding "that significant reforms
> in the real estate settlement process are needed to insure that consumers
> throughout the Nation are provided with greater and more timely
> information on the nature and costs of the settlement process and are
> protected from unnecessarily high settlement charges caused by certain
> abusive practices that have developed in some areas of the country.

281 B.R. at 120 (citing 12 U.S.C. § 2601(a)).  Section 2605 of RESPA, which applies to

servicers of mortgage loans provides in relevant part the following:

> (e) Duty of loan servicer to respond to borrower inquiries
>
> > (1) Notice of receipt of inquiry
> >
> > > (A) In general
> > >
> > > If any servicer of a federally related mortgage
> > > loan receives a qualified written request from the
> > > borrower (or an agent of the borrower) for
> > > information relating to the servicing of such
> > > loan, the servicer shall provide a written
> > > response acknowledging receipt of the
> > > correspondence within 20 days (excluding legal
> > > public holidays, Saturdays, and Sundays) unless
> > > the action requested is taken within such period.
> > >
> > > (B) Qualified written request
> > >
> > > For purposes of this subsection, a qualified
> > > written request shall be a written
> > > correspondence, other than notice on a payment
> > > coupon or other payment medium supplied by
> > > the servicer, that --
> > >
> > > > (i) includes, or otherwise enables
> > > > the servicer to identify, the name
> > > > and account of the borrower; and
> > > >
> > > > (ii) includes a statement of the

reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall-

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes --

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide

56

the borrower with a written explanation or clarification that includes --

> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

* * * * * *

(f) Damages and costs

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) Individuals

In the case of any action by an individual, an amount equal to the sum of --

> (A) any actual damages to the borrower as a result of the failure; and

> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

* * * * * *

(3) Costs

In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys fees incurred in connection

with such action as the court may determine to be reasonable
under the circumstances.

12 U.S.C. § 2605(e) and (f).

b.  Analysis

As a preliminary matter, the Debtor asserts, and EMC does not dispute, that EMC

is a "servicer" of a "federally related mortgage loan" as defined by RESPA's provisions.

12 U.S.C. §§ 2605(i)(2) and 2602(1).[44]  Additionally, for purposes of EMC's Rule 12(b)(6)

motion, the Court accepts as true that the Debtor sent a letter to EMC on September 5, 2006

and that that letter constituted a "Qualified Written Request" as defined by RESPA.  12

U.S.C. § 2605(e)(1)(B).  Accepting those facts as true, the issues include whether this Court

should adopt the holding of Ameriquest Mortgage Co. v. Nosek (In re Nosek), 354 B.R. 331,

339 (D. Mass. 2006); and whether the Debtor has satisfied her burden under the flexible

plausibility standard articulated by the Second Circuit in Iqbal in the absence of any

allegation of damages or violations of RESPA other than the failure to respond to the

Qualified Written Request.

i. The Nosek Decision

Relying primarily on the decision in Randolph v. IMBS, Inc., 368 F.3d 726 (7th Cir.

2004), the Debtor urged the Court to reject Nosek as one federal statute cannot preempt

another.  See 368 F.3d at 730.  The Court agrees with the Seventh Circuit's reasoning in

_____

[44] The Debtor did not allege that the law firm representing EMC, Ablitt &
Charlton, is a servicer, i.e., "the person responsible for servicing of a loan. . . ." 11 U.S.C.
2605(i)(2).

58

<u>Randolph</u> and respectfully disagrees with the reasoning, but not the result, in <u>Nosek</u>.

In the <u>Nosek</u> case, the debtor attempted to simultaneously prosecute a "Motion to Determine Amount of Liens" and an adversary proceeding under various federal statutes, including RESPA.  <u>Id.</u> at 333.  Both actions were based upon the lender's use of "suspense" accounts and its alleged inability to properly account for post-petition payments.  <u>Id.</u> Relying on <u>Walls v. Wells Fargo Bank, N.A.</u>, 276 F.3d 502 (9th Cir. 2002), the Massachusetts district court determined that while both remedial procedures sought the same effect, namely the resolution of a disputed claim, "the purposes of the Code in determining the disputed claims within the structure of the Bankruptcy Court conflict with RESPA's requirements."  <u>Id.</u> at 339.

In <u>Walls</u>, the United States Court of Appeals for the Ninth Circuit concluded that a debtor could not maintain simultaneous claims under the Bankruptcy Code and the FDCPA for violations of the discharge injunction. It reasoned:

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code . . . demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike.

<u>Walls</u>, 276 F.3d at 510 (quoting <u>MSR Exploration, Ltd. v. Meridian Oil, Inc.</u>, 74 F.3d 910, 914 (9th Cir. 1996)).  Accordingly, the district court in <u>Nosek</u> reasoned that:

> <u>Walls</u> stands for the proposition that where the remedial scheme in the Code conflicts with a remedial scheme of a separate statute, the former must occupy the field of bankruptcy proceedings rather than the latter.

<u>Nosek</u>, 334 B.R. at 339.

59

The United States District Court for the District of Massachusetts in <u>Nosek</u> was concerned about the types of litigation tactics that arguably characterize the Debtor's adversary proceeding against EMC when it held that "the Code's claim resolution process for ongoing bankruptcy proceedings trumps the alternative remedial procedure found in RESPA." 334 B.R. at 339. The United States Court of Appeals for the Seventh Circuit declined to adopt <u>Walls</u>, the case cited in <u>Nosek</u>, in a procedurally similar case. *See* <u>Randolph v. IMBS, Inc.</u>, 368 F.3d 726 (7th Cir. 2004). In <u>Randolph</u>, the debtor filed an adversary proceeding alleging a violation of the FDCPA based upon a creditor's improper acts to collect a debt during the pendency of her Chapter 13 case. <u>Id.</u> at 728. The lower court, the United States District Court for the Northern District of Illinois, had found that 11 U.S.C. § 362(h) preempted the FDCPA, and dismissed the action. <u>Id.</u> at 730. On appeal, the Seventh Circuit reversed the district court, emphasizing that "[o]ne federal statute does not preempt another . . . the right question is whether one implicitly repeals the other." <u>Id.</u> The court then noted that "[w]hether overlapping and not entirely congruent remedial systems can coexist is a question with a long history at the Supreme Court, and an established answer: yes." <u>Id.</u> at 731.

It is a cardinal rule of statutory construction that when two federal statutes address the same subject, courts must try to give effect to both. <u>United States v. Borden Co.</u>, 308 U.S. 188, 198 (1939). This Court finds no inherent conflict between the Bankruptcy Code and the provisions of RESPA which would preclude a debtor from pursuing RESPA claims during a pending bankruptcy case. In fact, a debtor's interest in a cause of action for

violations of RESPA or other federal consumer protection statutes which occurred prepetition, and, in the case of a Chapter 13 debtor, post-petition, are property of the estate. *See* 11 U.S.C. §§ 541(a)(1), 1306(a)(1). Accordingly, to the extent that <u>Nosek</u> holds that such claims are preempted by the Bankruptcy Code, this Court respectfully disagrees with the holding in that decision and shall not dismiss Count I based on that decision.

ii. Application of the Flexible Plausibility Standard to Count I

The absence of preemption, however, does not fully resolve the issue before the Court: whether the Debtor satisfactorily alleged a violation of RESPA in her Complaint. Notably, the Debtor did not set forth a causal link between EMC's failure to respond to the Qualified Written Request and any actual damages, and she did not so much as intimate the extent of her actual damages, if any. Those omissions are problematic in view of the new "plausibility standard," particularly because the Debtor did not assert that the failure to provide the payoff figure delayed Court approval of the Refinancing Motion or confirmation of her Plan. In short, the Complaint may be viewed as a "back door" objection to the EMC Claim necessitated by the Debtor's failure to the utilize the substantive and procedural mechanisms for determination of claims set forth in the Bankruptcy Code.

Although the Court has adopted the position espoused by the Seventh Circuit in <u>Randolph</u>, it is not unmindful of the waste of resources associated with the Debtor's Complaint and the policies articulated by the courts in <u>Walls</u> and <u>Rice-Etherly</u>, at least with respect to FDCPA claims. If, as was the case in <u>Bell Atlantic</u>, extensive discovery were

61

necessary to flush out the claims and any actual damages the Debtor may have suffered,
this Court would not hesitate to dismiss the Debtor's Complaint.  Because the forces
identified by the Second Circuit in <u>Iqbal</u> are not at play here, and because the Court must
accept as well-pled that EMC failed to comply with RESPA's provisions, the Court shall
afford the Debtor an opportunity to amend Count I.  The factual and legal issues pertinent
to Count I are simple and should require only a modicum of discovery, particularly as
EMC denied receipt of a "Qualified Written Request."

              4.  Count II - Breach of Contract

       Count II of the Debtor's Complaint is superfluous.  The Court has determined that
the fees, costs, and charges incurred by EMC were reasonable.  Moreover, because the
Court has not dismissed Count I, the Debtor has a remedy for any violation of RESPA; her
breach of contract action for EMC's failure to respond to the Qualified Written Request is
duplicative.

       The Debtor did not mention, let alone plead, breach of  the covenant of good faith
and fair dealing in her Complaint.  Under Massachusetts law, every contract is subject to
an implied covenant of good faith and fair dealing.  <u>Anthony's Pier Four, Inc. v. HBC</u>
<u>Assocs.</u>, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991).  This "implied covenant of good
faith and fair dealing provides that 'neither party shall do anything that will have the effect
of destroying or injuring the right of the other party to receive the fruits of the contract. .
. . '" <u>Id.</u> (quoting <u>Druker v. Roland William Jutras Assocs.</u>, 370 Mass. 383, 385, 348 N.E.2d
763 (1976)).  Even if the Court were to infer that the Debtor's breach of contract action is

predicated upon a breach of that covenant, Count II fails to state a separate claim apart from the RESPA claim.

### 5.  Count III - Violation of the Automatic Stay

#### a.  Applicable Law

Upon the filing of a bankruptcy petition, 11 U.S.C. § 362 operates as a stay to all actions to recover a claim against the debtor that arose before the commencement of the bankruptcy.  11 U.S.C. § 362(a)(1).[45]  On the request of a party in interest and after notice and a hearing, the Court shall grant relief from the stay for cause, or with respect to an act against property, if the debtor lacks equity in the property and the property is not necessary to an effective reorganization.  11 U.S.C. § 362(d)(1)-(2).  The Local Rules of this Court require that a party seeking relief from the automatic stay with respect to property to state "the fair market value and *the liquidation value* of the collateral."  Massachusetts Local Bankruptcy Rule 4001-1(b)(2)(D)(emphasis supplied).

#### b.  Analysis

The Debtor's bald allegation that EMC violated the automatic stay due to its "enumeration of additional fees, costs and charges in its motions for relief from the automatic stay" fails to state a plausible claim for relief, and is  frivolous and moot.  Not only did the Debtor fail to raise this issue in response to EMC's motions for relief from stay, the Court observes that the "enumerated fees" are nothing more than estimated costs

---

[45]The Debtor does not specifically cite what subsection of 11 U.S.C. § 362 EMC is alleged to have violated in her Complaint, though the Court presumes it to be (a)(1).

associated with a contemplated foreclosure proceeding, which EMC used to calculate the

liquidation value of the Property in accordance with Massachusetts Local Bankruptcy Rule

4001-1.  EMC's counsel used the word "estimated" to qualify almost every charge in the

October 5th Motion.  EMC did not make any demands for these amounts in its motions,

and its inclusion of fees, costs, and charges in its motions for relief from stay did not

constitute "overt action[s] to collect" from the Debtor in violation of the automatic stay.

Rather, the motions were overt actions to comply with procedures for obtaining relief from

the automatic stay and to address the Debtor's postpetition mortgage arrears, which at the

time of the October 5th Motion were in excess of $14,000.  The Debtor's intention to satisfy

the Mortgage through a reverse mortgage did not relieve her of her obligations under 11

U.S.C. § 1322(b)92) and1322(b)(5) with respect to her non-modifiable home mortgage.

Contrary to Debtor's Counsel's representations at the April 19, 2007 hearing, the

decision in In re Sullivan, No. 03-65486, 2007 WL 987328 (Bankr. N.D.N.Y. Apr. 2, 2007),

case inapposite.  Unlike the present case where the Debtor is challenging hypothetical

foreclosure costs in motions for relief from stay, which either have been denied or

withdrawn, the Sullivan case involved a mortgagee's attorney who sent the debtor a payoff

letter which included $500 in bankruptcy attorneys' fees which were not included in the

mortgagee's proof of claim and who refused to provide the debtor with an abstract of title

until the debtor paid his fees.  2007 WL 987328 at *1-2.

As there is no similarity between the Sullivan case and the present case, and the

Debtor has failed to cite any other case to support her position, the Court finds that the

64

Debtor has failed to articulate a "reasonably founded hope that the [discovery] process will reveal relevant evidence" to support her claims for violation of the automatic stay.  <u>Bell Atlantic</u>, 127 S.Ct. at 1967.  The Court shall enter an order dismissing Count III.

### 6.  Count IV - Violation of the FDCPA

The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Conduct constituting a violation of this section includes a false representation of "the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  A debt collector also may not use unfair or unconscionable means to collect any debt, which includes the collection of any amount, including interest, fees, charges, or expenses incidental to the principal obligation, not expressly authorized by the agreement creating the debt or permitted by law.  15 U.S.C. § 1692f(1).  *See generally* <u>Hart v. GMAC Mortgage Corp. (In re Hart)</u>, 246 B.R. 709 (Bankr. D. Mass. 2000).

Notably, the Debtor failed to allege which section of the FDCPA EMC ostensibly violated when it "misrepresented the amount due from Holland" in its motions for relief from stay and in its proof of claim.  Accordingly, the Court finds that the Debtor failed to satisfy the <u>Bell Atlantic</u> plausibility standard.  Moreover, her claim is moot in view of the Court's assessment of the fees, costs, and charges incurred by EMC.  Accordingly, the Court shall enter an order dismissing Count IV.

### 7.  Count V - Declaration and Redemption

As previously stated, the Debtor asserted that "[b]y reason of EMC's failure to

respond to the plaintiff's 'qualified written requests', an actual controversy exists between Holland and EMC as to the amount owed under the note and mortgage," and she sought a declaration of the amount owed to EMC, as well as damages, costs, and attorneys' fees. For the reasons stated above, the Court finds that Count V is moot.   The Court has determined the amount due and owing under the Mortgage in this Memorandum and no further relief is warranted under Count V.  Accordingly, the Court shall enter an order dismissing Count V.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter separate orders 1) approving the Application of Ablitt & Charlton, PC for Compensation as Counsel to Secured Creditor EMC Mortgage Corporation; 2) approving the Application of Shapiro & Kreisman for Compensation as Counsel to Secured Creditor, Washington Mutual Bank; 3) allowing in part and denying in part the Application for Compensation and Reimbursement filed by Attorney David G. Baker; and 4) dismissing all but Count I of the Debtor's Complaint against EMC.

By the Court,

_____
Joan N. Feeney
United States Bankruptcy Judge

Dated: August 2, 2007
cc: David G. Baker, Esq., John S. McNicholas, Esq., Carolyn Bankowski, Esq., U.S. Trustee